[Civ. No. 6769. Second Appellate District, Division Two.—June 10, 1931.]

A. & T. OIL COMPANY (a Corporation), Respondent, v. INTERSTATE OIL CORPORATION (a Corporation), Appellant.

Chapman & Chapman and Ward Chapman for Appellant.

Ellis & Vickers, Kimpton Ellis, Joseph W. Vickers and Towson T. MacLaren for Respondent.

ARCHBALD, J., *pro tem.*—Suit was brought by plaintiff against defendant for the recovery of certain sums of money claimed to be due under a contract dated December 31, 1921. From a judgment in plaintiff's favor defendant has appealed.

The evidence shows that plaintiff owned certain oil leases in the Signal Hill district, Long Beach, California, as well as in the Huntington Beach district. A contract was entered into with defendant whereby plaintiff assigned such leases to the former, the agreement being that defendant was to assume the obligations of the leases so far as the property herein involved is concerned and was to be reimbursed from the proceeds of the oil produced on the property for all moneys expended by it in connection with the obligations of said leases, including the development of wells, and was thereafter to operate such property "as a producing property, and pay the royalties, then the operating expenses including insurance, both compensation and fire, and superintendence, then . . . party of the first part [plaintiff] . . . shall receive 37–1⁄2% of the market price of the net oil, or other hydrocarbon substances produced, saved or sold; said market price to be based on the market price of oil, or other hydrocarbon substances of like gravity, produced in that field, the remainder, or the 62–1⁄2% to be the property of the party of the second part [defendant]". It was also provided "that all of the transactions covering this agreement shall be carried in a special account, subject to the inspection by the party of the first part at all reasonable times during business hours"; that "all of the material placed upon the premises by the party of the second part" shall remain its property until fully paid for out of production, when it should be "owned by the said party of the first part . . . in proportion to the interest heretofore defined for the distribution of net profits", and that if any of it was sold said first party was to "participate in the net profits therefrom, in the same percentage". Wells were produced, defendant repaid and the production was distributed thereunder as agreed for a period of years, that is, the net amounts actually received for the oil sold, most of it being disposed of at the posted

Standard Oil Company prices, although for a period of about twelve months prior to December, 1928, it was sold for a bonus of from five to ten cents a barrel over and above such posted price. In July, 1928, an item of $1,009.50, legal expense incurred by defendant in defending a suit for declaratory relief involving the lease on the property, was charged against the net production of the property, which, of course, reduced the amount of the distribution to plaintiff. In May, 1928, and thereafter, the bonus received above said posted price was retained by defendant, and distribution made with plaintiff on the posted Standard Oil price only. It also appears that certain oil was sold by defendant to the California Eastern Company, which company failed, and that plaintiff's share of such amount was $995, which was never paid.

The court found that the term "market price", as used in the agreement quoted from, meant "the highest price which the said net oil and other hydrocarbon substances produced, saved and/or would, or did, bring in the Signal Hill district of Los Angeles county, where it was offered for sale, and which those having the means and inclination would or did pay", and not the posted price of the Standard Oil Company in said district; that under said agreement defendant was to pay plaintiff its "percentage, or proportion, of the market price of said substances" when they were sold and not when payment was received by defendant; that the sum of $1,009.50 paid by defendant for legal expense as not included within the term "operating expenses" as used in said contract, and was not deductible from the market price of the net production before crediting plaintiff with its said percentage or proportion. The court also found that the sum of $995 was due plaintiff and was unpaid. Defendant contends that the court erred in finding as above set forth.

Expert evidence was introduced to show that under the custom or usage of the operators in the Signal Hill district in 1921 the term "market price", as used in the contract in question, was synonymous with the posted price of the Standard Oil Company. The court found contrary to such contention. There is evidence from which the court might well have concluded that there was no such custom. N. W. Lawrence, a witness for defendant and an employee of the Standard Oil Company at the time, gave the following testimony: "Q. Did the Standard Oil Company, to your

knowledge, buy any oil in the Signal Hill district in 1921? A. To the best of my knowledge they did not. However I was merely an observer covering the several fields, and they may have. Q. Shell [Oil Company] was the producer at that time? A. The first producer. Q. Do you remember when the first well was brought in? A. Yes. Q. Do you remember what year it was? A. 1921, I believe." W. N. Brower, one of defendant's witnesses, testified that while the posted price of the Standard Oil Company was the controlling factor governing prices, he did not mean by that that no other company paid a higher price, but that ordinarily the price would in some way be based on that; that it was something to start from. Ed McAdams, a witness for plaintiff, testified: "Q. At that time [1921] was there any custom or usage which declared market price in the contract to be that price offered and published by the Standard Oil Company from time to time in its bulletin? A. Not to my knowledge." Mr. A. H. Greene, a witness for plaintiff, testified: "Q. From your experience, Mr. Greene, what did the term 'market price' mean in December, 1921, in Southern California, particularly in and around Los Angeles, the Signal Hill district? A. To us it always meant the best obtainable price." The parties themselves seem to have put that same construction on the contract, as we have seen that for a long period of time expenses of production, etc., were deducted from the price at which the oil was actually sold and the net was distributed under the contract. "Nothing is of more value in the construction of a contract inartificially phrased than to learn the understanding which was given to it and acted upon by both parties. (*D. Ghirardelli & Co.* v. *Students' E. & T. Co.,* 175 Cal. 427, 430 [166 Pac. 16].) It is true that the secretary of defendant testified that such distribution was made—"I think it was through, I am determined, an oversight of the bookkeeper"—but he also testified that he was in charge of the books, and the court could very well have disregarded the explanation and have placed some weight on the practical construction that defendant seemed to give to the contract.

Regardless of usage or custom, however, we are convinced, taking it by its four corners, that the contract shows an intention on the part of both parties to distribute the net price received from the sale of the hydrocarbon substances pro-

duced, when sold at the fair market price prevailing in that field at the time. Defendant, under the contract, was to develop and operate the wells and reimburse itself out of the production for all development and operating expenses, and then plaintiff was to receive thirty-seven and one-half per cent of the market price of the net oil, etc., "produced, saved or sold, such price to be based upon the market price of oil or other hydrocarbon substances of like gravity produced in that field, *the remainder, or the 62½%, to be the property of the party of the second part"*. We have italicized certain of the language to emphasize what seems to us a clear declaration of the fact that the parties were dividing between them the net price received for all hydrocarbon substances *sold* by the second party. They were dividing one hundred per cent of the net received, not ninety per cent or any less percentage, and the part that defendant was to receive is just as definitely fixed as plaintiff's percentage, the language not permitting defendant to make any deductions not contemplated by the agreement in determining the net that should be so divided. We think the finding of the court is correct from the standpoint of legal interpretation of the contract, and of course the finding on the question of fact, injected into the suit, as to "usage and custom", being based on conflicting evidence cannot be disturbed by us.

██ There is evidence which supports the finding that defendant was not entitled to deduct from the total production, in determining the net, the legal expense of $1,009.50. Mr. Germain, who was president of plaintiff company, testified that when he was served with the papers in the suit in question he talked with Mr. White of the defendant company, who informed him they were employing Mr. Chapman to represent them, to which the witness responded that there was no need for them both to have attorneys as the attorney for defendant would represent their interest as well. Mr. Germain then said: "I asked him to notify Mr. Chapman to that effect and to have Mr. Chapman write me a letter stating that he would appear for us and without cost to us." Such letter was introduced in evidence, and so far as material reads: "I am writing to say that I shall appear for the Interstate Oil Corporation and yourself in the suit . . . and look to the Interstate Oil Corporation for my compensation, and you will be put to no expense in the matter. Mr.

Conger informs me that this is the understanding he has had with you." Mr. Conger was the secretary of defendant company and came into the conversation between Mr. White and Mr. Germain with the result that he was delegated to procure the letter. We are of the opinion that, considering the agreement and the evidence, the court did not err in finding as it did on this question. It might well be questioned whether as a matter of law under the agreement the term "operating expenses" would apply to anything except expenses incurred in the actual operation of the wells after they were drilled, and not to legal expenses in defending a suit to determine whether defendant would sink a well to the deeper sands or permit the owner to do so, which was the object of the suit referred to.

Appellant apparently does not question the finding of fact made by the trial court that the amount of $995, plaintiff's proportion of the price at which certain oil was sold to the California Eastern Company, is owing, but claims that such sum was not due, by reason of an arrangement made with plaintiff whereby it was to wait for payment of this amount until the money should be collected by defendant. Mr. Rice, a former officer of plaintiff corporation, with whom Mr. White had a conversation on the subject in which he said Mr. Rice agreed to "accept the receiver's certificates and settlement for plaintiff's portion of the purchase price deferred until the account was liquidated", said in regard thereto: "Q. Mr. Rice, you have heard Mr. White's testimony. Did you at any time ever tell Mr. White, or did Mr. White ever tell you, or did you tell any other officer of the company, of the defendant company, or they tell you, that they need not pay the $995.00 from the California Eastern Company until received by them? A. No." The court had a perfect right under the state of the record to find as it did that said sum was due and unpaid, not only by reason of the state of the evidence regarding any such agreement, but also by reason of the fact that the court could infer from the evidence that there was no consideration for such an agreement, assuming one was made.

Judgment affirmed.

Craig, Acting P. J., and Thompson (Ira F.), J., concurred.